IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

DEVELOPMENT PROFESSIONALS              )
INC.-MAKING CENTS INTERNATIONAL        )
LLC,                                   )
                                       )
      Plaintiff,                       )
                                       )
      v.                               )      Civil Action No. 1:24-cv-1529 (RDA/LRV)
                                       )
BANK OF AMERICA, N.A.,                  )
*et al.*,                              )
                                       )
      Defendants.                      )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Bank of America, N.A.'s ("Bank of America") Motion to Dismiss (Dkt. 13) and Defendant JPMorgan Chase Bank, N.A.'s ("Chase") Motion to Dismiss (Dkt. 16) (collectively, the "Motions"). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter is fully briefed and ripe for disposition. Considering the Complaint (Dkt. 1-2), Defendants' Memoranda in Support (Dkts. 14, 17), Plaintiff's Opposition (Dkt. 22), and Defendants' Replies (Dkts. 23, 26), this Court GRANTS the Motions for the reasons that follow.

## I. BACKGROUND

### A. Factual Background[1]

Plaintiff Development Professionals Inc.-Making Cents International LLC ("DPI-MCI") is a limited liability company organized to conduct a joint venture between its two members,

---

[1] For purposes of considering the Motion to Dismiss, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Development Professionals, Inc. ("Development Professionals") and Making Cents International, Inc. ("Making Cents"), formed for the purpose of pursuing and executing certain contracts with the United States Agency for International Development. Dkt. 1-2 ¶ 7. To conduct joint venture business, DPI-MCI opened a "Business Advantage" deposit account at Bank of America. *Id.* ¶ 10. DPI-MCI used the account to receive payments from clients and to disburse funds to the joint venture members and other business partners. *Id.*

On June 13, 2023, DPI-MCI manager Natalija Stamenkovic received an email purporting to come from Kea Profitt, the Finance Manager at Making Cents, requesting that upcoming joint venture payments to Making Cents be made to a new bank account at Chase Bank. *Id.* ¶ 11. The email stated that the account name was "Making Cents International" and the bank address was "5505 Kirby Drive, Houston, Texas," and provided an account number, ACH routing number, and wire routing number. *Id.* ¶ 12. Tim Nourse, the CEO of Making Cents, appeared to be copied on the email. *Id.* ¶ 13. Also appearing to be copied on the email was Jaline Davis-Diehl, CFO of Development Professionals. *Id.* In fact, the email was not from Profitt, nor was Nourse copied. *Id.* ¶ 14. And, Development Professional's email system was compromised to inhibit Davis-Diehl from seeing emails from Stamenkovic and vice versa. *Id.* ¶ 16.

Making Cents does not operate in Texas and has never opened a bank account there. *Id.* ¶ 15. No one in Texas has the authority or necessary documents to open a bank account at Chase on Making Cents' behalf. *Id.* Upon information and belief, Plaintiff alleges this new account at Chase (the "Fraudulent Chase Account") was opened by an imposter (the "Profitt Imposter"), not acting with authority on behalf of Making Cents. *Id.*

Stamenkovic, believing she was corresponding with Profitt and Nourse, replied to the Proffitt Imposter that she did not know to what payment the email was referring. *Id.* ¶ 17. The

Profitt Imposter responded by providing two legitimate invoice numbers and amounts—$36,023.13 and $16,114.59—for invoices issued by Making Cents to DPI-MCI. *Id.* ¶ 18. On June 14, 2023, Stamenkovic responded to seek clarification on the account change request. *Id.* ¶ 19. The Profitt Imposter responded that Making Cents was "having [a] problem" with its current account and again requested payment of two invoices to the Fraudulent Chase Account. *Id.* ¶ 20. Stamenkovic wrote back that she needed an email from Nourse authorizing the change. *Id.* ¶ 21. The email account appearing to be Nourse (the "Nourse Imposter") responded with approval. *Id.* ¶ 22. The email included a replica of Nourse's legitimate email signature. *Id.*

On June 15, 2023, Stamenkovic attempted to initiate a business-to-business Automated Clearing House ("ACH") transfer from DPI-MCI's Bank of America account using the information provided by the Profitt Imposter but was unable to do so without inputting an address for Making Cents. *Id.* ¶ 23. Stamenkovic emailed the Profitt Imposter and asked for an address for Making Cents. *Id.* ¶ 24. The Profitt Imposter replied with a legitimate address for Making Cents in Washington, D.C., which Stamenkovic entered to complete the ACH transfer. *Id.* ¶ 24. On June 16, 2023, Stamenkovic wrote the Profitt Imposter to confirm that a payment of $36,023.13 had been made. *Id.* ¶ 25. The Profitt Imposter responded and thanked her. *Id.*

On June 20, 2023, the Profitt Imposter emailed Stamenkovic and requested payment to the Fraudulent Chase Account of an attached invoice from Making Cents for $71,527.40. *Id.* ¶ 26. The next day, the Profitt Imposter again emailed Stamenkovic and requested payment to the Fraudulent Chase Account of an attached invoice from Making Cents for $55,195.28. *Id.* ¶ 27. The invoices attached to the June 20 and 21 emails were legitimate and had been obtained by unknown means. *Id.* ¶ 28. The emails also included identical replicas of Profitt's email signature. *Id.*

On June 22, 2023, the Profitt Imposter again emailed Stamenkovic and requested payment to the Fraudulent Chase Account for the $71,527.40 and $55,195.28 invoices, both of which were attached to the email.  *Id.* ¶ 29.  As with the June 20 and 21 emails, the email signature replicated Profitt's and the attached invoices were legitimate.  *Id.*  Stamenkovic responded to the Profitt Imposter on June 23, 2023, to request clarification on the payment amounts.  *Id.* ¶ 30.  The Profitt Imposter replied with the invoice numbers, amounts of $71,527.40 and $55,195.28, and requested payment via ACH to the Fraudulent Chase Account.  *Id.*  Stamenkovic wrote back that same day and said the payments had been made.  *Id.*  The $71,527.40 payment was processed on or around June 23, 2023, and the $55,195.28 payment was processed on or around June 27, 2023.  *Id.* ¶ 31. Stamenkovic received confirmation numbers from Chase and Bank of America for these latter transfers but not the first transfer on June 16.  *Id.*

On July 5, 2023, the Profitt Imposter emailed Davis-Diehl and said that Making Cents had not received payment of the June 23 or June 27 transfers and asked that Davis-Diehl "request a call back."  *Id.* ¶ 32.  The same day, Davis-Diehl emailed Bank of America representative Ashli Regan to determine why the funds transferred to Making Cents in June had not been received.  *Id.* ¶ 33.  Regan instructed Davis-Diehl to contact Chase and to recall the transfer.  *Id.*  Later that day, Stamenkovic learned that Making Cents had neither requested the June funds transfers nor received the funds.  *Id.* ¶ 34.  Davis-Diehl emailed Regan and told her to freeze the DPI-MCI Bank of America account immediately, recall the transfers, and return the funds.  *Id.* ¶ 35.  Davis-Diehl and Stamenkovic also called the Bank of America fraud department to report the incident and file a claim.  *Id.*  The next day, Regan herself reported the incident to Bank of America's fraud department.  *Id.* ¶ 36.

A day later, on July 7, Davis-Diehl followed up with Regan to ask when the funds would be returned.  *Id.* ¶ 37.  By the morning of July 10, Davis-Diehl had not received a response, so she emailed Regan again.  *Id.* ¶ 38.  Regan responded and said that the fraud team was working on the claim and that the investigation could take up to 30 days.  *Id.* ¶ 39.  In further email correspondence later that morning, Regan told Davis-Diehl that DPI-MCI should expect to receive a packet of forms by mail, and that resolution of the claim would depend on how quickly Bank of America received the completed forms.  *Id.* ¶ 40.  Regan added that, once the forms were received, a letter would be sent to Chase requesting that the funds be returned, and that Chase would have 60 days to answer.  *Id.*

Although the DPI-MCI Bank of America account was supposed to have been frozen, on July 11 and 12, 2023, several payments were processed from the account.  *Id.* ¶ 41.  Davis-Diehl urgently called Regan and left a voicemail.  *Id.* ¶ 42.  Regan responded by email and said that the account had not been frozen as requested:

> I spoke to our fraud team again and the representative confirmed a "credit only" restriction on the account was requested so inflows of funds don't get compromised but outflows get checked before they leave the account.  However, the previous representative did not follow through with the request.  The restriction has been placed today, and I filed a formal complaint with the fraud department for not placing the restriction appropriately.  A supervisor will pull the previously recorded calls and investigate why the representative did not follow through on the request. I will keep you posted as this progresses and I learn more, and I apologize for the scare it caused.

*Id.*

On July 19, 2023, Regan emailed Stamenkovic and Davis-Diehl to confirm that the fraud team had received the forms needed to process the claim and that future updates would come directly from them.  *Id.* ¶ 43.  Regan also forwarded the fraud team's latest correspondence, which was a letter addressed to Stamenkovic informing her:

> We've completed our review of your claim. Our records indicate that we completed the transfer(s) according to the instructions you provided us, and therefore no error occurred. Based on this, your account won't be credited.
>
> However, as a courtesy, we're researching your inquiry with the other party in an attempt to recover the funds for you, and will notify you if we need additional information. Keep in mind it may take up to 45 calendar days for us to hear back from the other party. If we receive any additional information from them[,] we'll contact you.
>
> Please only send money to family, friends and people you know and trust.

*Id.* Regan confirmed in later email correspondence with Davis-Diehl that the claim was denied because Bank of America "acted on instructions given by an authorized party on the account." *Id.* ¶ 44. She further confirmed that Bank of America had asked Chase to return the funds, "but if they do not, there is nothing else we can do. Wire recalls are at the mercy of the receiving bank returning the funds." *Id.*

Unsatisfied with the response, Davis-Diehl and Stamenkovic called the Bank of America fraud department to request more information. *Id.* ¶ 45. The customer service agent explained that Bank of America was attempting to recover the funds from Chase, but that Chase had 60 days to respond and there was nothing else to do but wait. *Id.* Davis-Diehl and Stamenkovic next called Chase's fraud department to report the transfer and ask that the funds be returned. *Id.* ¶ 46. The Chase representative indicated that the receiving account had already been flagged as fraudulent but would not disclose any additional information. *Id.* Davis-Diehl and Stamenkovic also filed criminal reports with the Fairfax County Police Department, the Virginia Attorney General's Office, and the Federal Bureau of Investigation. *Id.* ¶ 47.

On July 24, Davis-Diehl contacted Regan to ask for an update on the fraud case. *Id.* ¶ 48. Regan said an update would be provided when Bank of America heard back from Chase. *Id.* She also said that "Global Finance Crimes team" was working on the matter. *Id.* Davis-Diehl also

asked to update the address associated with the account to DPI-MCI's new location in Vienna, Virginia, but Regan said that no changes could be made while the account was frozen. *Id.* The next day, Daivs-Diehl received an auto-response from Regan stating that she no longer worked at Bank of America. *Id.* ¶ 49.

About three weeks later, on August 14, Davis-Diehl emailed Regan's supervisor, Mike Daily, to again request an update. *Id.* ¶ 50. A Bank of America representative responded that there had been no developments and that September 13, 2023, was the deadline to hear back from Chase. *Id.* On September 15, Davis-Diehl contacted Daily to request a final resolution letter, which DPI-MCI had not yet received. *Id.* ¶ 51. Daily told her a letter had been mailed to DPI-MCI's old office address in Washington, D.C. and that the funds would not be returned:

> We checked in with the Fraud team for an update and they told us that the attempt for Bank of America to recover the funds from Chase was unsuccessful. Please see the attached letter—it was sent to the address on file at the time which was the old DC address. Jaline [Davis-Diehl] mentioned that it was brought to Chase bank's attention when it happened and flagged as fraud. I suggest contacting their fraud team to see if you can get more details.
>
> Sorry for the bad news.

*Id.* Davis-Diehl called Daily to push for more details, but he directed her to Chase. *Id.* ¶ 52.

Unsatisfied, Davis-Diehl went to the local Bank of America branch and spoke with the manager. *Id.* ¶ 53. The manager suggested she call the fraud department to press for more details and ask them to revisit the claim. *Id.* Per the manager's recommendation, Davis-Diehl emailed Daily to demand more information, including explanations as to whether Chase had recovered any of the funds, and, if so, why they had not been returned. *Id.* ¶ 54. Daily responded and agreed that Bank of America had provided little detail on the disposition of the claim but asserted that "we are not privy to any more detail on this from Chase" and that Chase was "the party to ultimately make

a decision on the return of funds." *Id.* ¶ 55. Daily nonetheless speculated that the funds were no longer with Chase and so could not be recovered for that reason. *Id.*

In November 2023, Development Professionals, on behalf of DPI-MCI, wrote to Bank of America through counsel to demand immediate disclosure of all information related to the fraudulent transfers and Bank of America's investigation of them. *Id.* ¶ 56. Bank of America did not respond. *Id.* ¶ 57.

## B.   Procedural Background

On July 19, 2024, Plaintiff DPI-MCI filed the instant Complaint in the Circuit Court for Fairfax County alleging (1) fraudulent concealment against Bank of America and Chase, (2) misdescription of a beneficiary against Chase, and (3) negligence against Chase. Dkt. 1-2. On August 30, 2024, the action was removed to this Court. Dkt. 1. On October 4, 2024, Defendants filed Motions to Dismiss and Memoranda in Support. Dkts. 13-14, 16-17. On October 23, 2024, Plaintiff filed its Opposition. Dkt. 22. On October 29, Bank of America filed its Reply. Dkt. 23. And, on October 30, 2024, Chase filed its Reply. Dkt. 26.

## II.   LEGAL STANDARD

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)

(citations omitted).  "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'"  *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)).  Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion, *see Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015), but they "may consider documents . . . attached to the motion to dismiss, as long as they are integral to the complaint and authentic[,]" *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

Claims of fraud are subject to the additional requirements of Rule 9(b). Fed. R. Civ. P. 9(b). Rule 9(b) requires that the plaintiff name the time, place, and contents of the false misrepresentations, as well as the identity of the person making the misrepresentation and what he obtained thereby; facts often referred to as the who, what, when, where, and how of the alleged fraud. *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008).

## III.  ANALYSIS

In the Motions, Defendants make several categories of arguments.  *First*, Defendants argue that Plaintiff's common law claims for fraudulent concealment (Count I) and negligence (Count III) are preempted and otherwise barred by the economic loss doctrine.[2]  *Second*, Defendants

---

[2] The economic loss doctrine precludes a tort action based on the breach of a duty that is purely contractual.  *See Abi-Najm v. Concord Condo., LLC*, 699 S.E.2d 483, 488 (Va. 2010). Because the Court concludes that Plaintiff has not sufficiently alleged that Defendants breached a duty owed to it, the Court does not reach Defendants' economic loss doctrine arguments.

alternatively argue that Plaintiff has failed to state a claim for fraudulent concealment because it has failed to allege that Defendants concealed information that they were required to disclose, that Defendants intentionally or knowingly concealed a material fact, that Defendants intended to mislead Plaintiff, or that Plaintiff reasonably relied on Defendants' representations or omissions. Additionally, Chase argues that Plaintiff failed to state a claim for negligence because it failed to allege a legal duty.  *Third*, Chase argues that Plaintiff failed to state a claim for misdescription of a beneficiary (Count II) because Plaintiff has not alleged and cannot allege that Chase had actual knowledge that the transaction information did not match the incoming transaction.  Because the Court finds that Plaintiff has failed to state a claim on any count, the Motions will be granted on that basis.

### A.  Whether Counts I and III Are Preempted

As a general rule, "state laws that conflict with federal law are without effect." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (internal quotation marks omitted).  Specifically, relevant here, the Fourth Circuit has determined that Subpart B of Regulation J of the Federal Reserve Board, which incorporates Article 4A of the Uniform Commercial Code ("UCC"), preempts certain claims under state law.[3]  *Donmar Enters., Inc. v. S. Nat'l Bank of N.C.*, 64 F.3d 944, 949 (4th Cir. 1995).  Article 4A "governs a specialized method of payment referred to in the Article as a funds transfer."  *Schlegel v. Bank of Am., N.A.*, 628 S.E.2d 362, 366 (Va. 2006); Va. Code Ann. § 8.4A-102, cmt.  A "funds transfer" is "the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order," and "includes any payment order issued by the originator's bank or an intermediary bank intended to

---

[3] Article 4A of the UCC has also been codified under Virginia law, Va. Code § 8.4A *et. seq*., and Texas law, Tex. Bus. & Comm. Code § 4A *et seq.*

carry out the originator's payment order."[4]  Va. Code Ann. § 8.4A-104.  Because the Federal Reserve sought "a uniform and comprehensive national regulation of Fedwire transfers," if a bank complies with the requirements of Article 4A in conducting a funds transfer, "any liability founded on state law of negligence or wrongful payment [as to the transfer] would necessarily be in conflict with the federal regulations and is pre-empted."  *Donmar Enters., Inc.*, 64 F.3d at 949.

Applying this standard, the Fourth Circuit and other courts have repeatedly held "that a plaintiff's [state law] claim that a bank credited a wire to the correct account number but the wrong named beneficiary [*e.g.*, the beneficiary was pretending to be someone else] is preempted by [Regulation J (adopting Article 4A)]."  *Nirav Ingredients, Inc. v. Wells Fargo Bank, N.A.*, 2022 WL 3334626, at *2 (4th Cir. Aug. 12, 2022) (citing *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 223 (4th Cir. 2002)); *see also Peter E. Shapiro, P.A. v. Wells Fargo Bank N.A.*, 795 F. App'x 741, 750 (11th Cir. 2019) (affirming district court's dismissal of common law negligence claim on Article 4A preemption grounds where the "complaint alleged no negligence beyond the scope of the erroneous funds transfer"); *Navy Fed. Credit Union v. Lentz*, 78 Va. App. 250, 260 (2023) (finding preemption where plaintiff "only allege[d] a breach of duty regarding the transfer of a wire").

However, courts have also held that common law claims based on a bank's conduct *before* or *after* a funds transfer—including alleged negligence in opening an account or an alleged failure to assist in a fraud investigation—are not preempted by Regulation J (adopting Article 4A).  *See Elkin Valley Baptist Church v. PNC Bank, N.A.*, 2024 WL 4150083, at *37 & n.112 (W.D. Pa. Sept. 10, 2024) (finding  that "the weight of authority holds that there is no preemption with respect

---

[4] As alleged here, DPI-MCI is the originator, Bank of America is the originator's bank, the alleged fraudster is the beneficiary, Chase is the beneficiary's bank, and the ACH transactions initiated by DPI-MCI were the payment orders.

to banks' assertedly negligent conduct that pre-dates or post-dates a funds transfer") (collecting cases); *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 223-24 (4th Cir. 2002) (holding allegations that bank was "negligent by reason of allowing [an alleged fraudster] to open the bank account under the [false] name," "failing to discover [the alleged fraudster]'s improper use of the account," and "failing to train its employees to recognize and prevent fraud" were not preempted); *S&S Worldwide, Inc. v. Wells Fargo Bank*, 509 F. Supp. 3d 1154, 1162 (N.D. Cal. 2020) (finding that claims based on opening of account and refusal to assist with recovery of funds not preempted); *Texas Star Nut & Food Co. v. Truist Bank*, 632 F. Supp. 3d 664, 669-70 (D. Md. 2022) (finding that state-law negligence claims involving "the opening and use" of a fraudulent account were not preempted); *Golden State Concessions LLC v. Wells Fargo Bank NA*, 2021 WL 5002222, at *4 (N.D. Cal. Mar. 10, 2021) (finding that negligence claim based on the failure to monitor suspicious accounts or assist with fraud investigation were not preempted).

Thus, because Plaintiff's fraudulent concealment claim is based on Defendants' refusal to cooperate with its efforts to gather information about the fraudulent funds transfers *after* they occurred and its negligence claim is based on Chase's alleged negligence in opening the fraudulent account *before* the funds transfers, neither Count I nor Count II is preempted, and the Motions will be denied as to this argument.

## B.  Whether Plaintiff States a Claim for Fraudulent Concealment Against Bank of America

As the Virginia Supreme Court has observed, a "charge of fraud is one easily made . . . [but] [f]raud cannot be presumed."[5] *Redwood v. Rogers*, 105 Va. 155, 158 (1906).  Under Virginia law, regardless of the theory of fraud, the plaintiff must ultimately "prove by clear and convincing

---

[5] In their briefing, the parties focused on Virginia law for the fraudulent concealment claim without conducting a conflict of laws analysis.  Accordingly, for the purposes of this Memorandum Opinion and Order, the Court will do the same.

evidence: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *State Farm Mut. Auto. Ins. Co. v. Remley*, 270 Va. 209, 218 (2005) (quoting *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 85 (1999)); *see also Van Deusen v. Snead*, 247 Va. 324, 327-29 (1994) (discussing the same elements with respect to fraudulent concealment). For a fraudulent concealment claim, or a claim of fraud by omission, a plaintiff satisfies the false representation element through a showing that the defendant concealed facts which the defendant had a duty to disclose. *See Bank of Montreal v. Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999) (applying Virginia law) ("Silence does not constitute concealment in the absence of a duty to disclose."); *see also Norris v. Mitchell*, 255 Va. 235, 240-41 (1998) (claim for fraud by concealment rejected, in part, because of holding that defendants had no duty to disclose).[6]

Here, Plaintiff does not plead sufficient allegations to raise a reasonable inference that Bank of America had any intent to mislead Plaintiff. Indeed, the allegations in the Complaint tend to show that Bank of America attempted to help Plaintiff recover the funds at issue from Chase without success. *See, e.g.*, Dkt. 1-2 ¶ 33 ("Davis-Diehl emailed Bank of America representative Ashli Regan to determine why the funds transferred to Making Cents in June had not been received. Regan instructed Davis-Diehl to contact Chase and to recall the transfer."); *id.* ¶ 36

---

[6] In its Opposition, Plaintiff states that "[f]raudulent concealment in Virginia is an 'affirmative act or representation designed to prevent, and which does prevent, the discovery of [a] cause of action." Dkt. 22 at 10 (quoting *Studco Building System. U.S., LLC v. 1st Advantage Federal Credit Union*, 509 F. Supp. 3d 560 (E.D. Va. 2020)) (citing *Culpeper Nat. Bank v. Tidewater Improvement Co.*, 119 Va. 73, 83-84 (1916); *Newman v. Walker*, 270 Va. 291, 296-98 (2005)). As the Virginia cases on which Plaintiff relies make clear, however, this is the legal framework for analyzing "fraudulent concealment" as a means for equitably tolling a statute of limitations, not for analyzing fraudulent concealment as a standalone claim—which it must be here, as it is the only claim asserted against Bank of America. *See Culpeper Nat. Bank*, 119 Va. at 84 (addressing a statute of limitations jury instruction); *Newman*, 270 Va. at 298 (addressing the applicable statute of limitations).

("The next day, Regan herself reported the incident to Bank of America's fraud department."); *id.* ¶¶ 39-40 ("Regan responded and said that the fraud team was working on the claim and that the investigation could take up to 30 days. . . . Regan added that once [relevant] forms were received, a letter would be sent to Chase requesting that the funds be returned, and that Chase would have 60 days to answer."); *id.* ¶ 43 (quoting Bank of America as saying, "as a courtesy, we're researching your inquiry with the other party in an attempt to recover the funds for you . . . . If we receive any additional information from them we'll contact you."); *id.* ¶ 44 ("[Regan] further confirmed that Bank of America had asked Chase to return the funds, 'but if they do not, there is nothing else we can do.  Wire recalls are at the mercy of the receiving bank returning the funds.'").

Although Plaintiff argues that the instant case is analogous to *Studco Building System U.S., LLC v. 1st Advantage Federal Credit Union*, 509 F. Supp. 3d 560 (E.D. Va. 2020), that case is distinguishable.  In *Studco*, the court found that the plaintiff had pleaded facts which supported a reasonable inference that the defendant "acted with the intent to misrepresent" where the plaintiff alleged "that it made several requests in which [the defendant] initially provided *some*, but not all, information concerning [its customer]'s identity, activity, and whereabouts but then refused to keep responding to [the plaintiff's] additional inquiries."  *Id.* at 573.  In any event, the *Studco* decision is not binding here.[7]

Moreover, Plaintiff has failed to allege sufficient facts to plausibly demonstrate the falsity of any of the statements made by Bank of America.  Plaintiff pleads that, "[u]pon information and belief, Bank or America [sic], as a result of its months-long fraud investigation, is aware of the

---

[7] Moreover, the ultimate verdict in favor of the *Studco* plaintiff was reversed on appeal. *See Studco Building Sys. US, LLC v. 1st Advantage Fed. Credit Union*, 133 F.4th 264, 277 (4th Cir. 2025) (not addressing fraudulent concealment, but reversing and remanding with instructions to enter judgment in favor of the defendant).

identity of the thief or thieves and the status of the fraudulently obtained funds."  Dkt. 1-2 ¶ 60.

Such allegations based on information and belief "veer away from supporting plausible inferences

and turn instead toward unsupportable conclusory talismanic statements."  *Carter v. Va. Dep't of*

*Game & Inland Fisheries*, 2018 WL 3614975, at *9 (E.D. Va. July 27, 2018).  Plaintiff provides

no supporting allegations that render plausible its beliefs in this regard..  And, in its Opposition,

Plaintiff points only to allegations that "the investigation lasted nearly two months and involved

communications with Chase," Dkt. 22 at 11 (citing Dkt. 1-2 ¶¶ 43, 51), which also cannot support

a reasonable inference that Bank of America knows the identity of the alleged fraudster or the

status of the funds.

Indeed, Plaintiff alleges that a Bank of America representative "agreed that Bank of

America had provided little detail on the disposition of the claim but asserted that '[Bank of

America is] not privy to any more detail on this from Chase' and that Chase was 'the party to

ultimately make a decision on the return of funds'" and only "*speculated* that the funds were no

longer with Chase and could not be recovered for that reason."  Dkt. 1-2 ¶ 55 (emphasis added).

And Plaintiff alleges that Bank of America "suggest[ed] contacting [Chase's] fraud team to see if

[Plaintiff could] get more details," which also belies an inference that Bank of America intended

to mislead Plaintiff.  Dkt. 1-2 ¶ 51.

In short, Plaintiff's allegations fail to create a reasonable inference that Bank of America

intended to mislead Plaintiff.  Additionally, Plaintiff's allegations with respect to the falsity of any

statements by Bank of America are speculative and based upon information and belief without

supporting facts rendering Plaintiff's beliefs plausible.  Accordingly, Plaintiff fails to state a claim

for fraudulent concealment against Bank of America, and Bank of America's Motion will be

granted on this basis.

### C.  Whether Plaintiff States a Claim for Fraudulent Concealment Against Chase

As to Chase, Plaintiff fails to allege that Chase had a duty to disclose information to Plaintiff.  As a preliminary matter, Plaintiff does not allege that it was a Chase customer, and, in general, "a bank does not owe noncustomers a duty of care."  *Eisenberg*, 301 F.3d at 227 (collecting cases).  Nonetheless, Plaintiff argues that here Chase did have an obligation to Plaintiff because the fraudulent account was opened in the name of a member entity of the DPI-MCI joint venture.  Though Plaintiff points to one court case that held that "a bank owes a duty of reasonable care to the person in whose name, and upon whose identification, an account is opened to ensure that the person opening the account and to whom checks are given is not an imposter," *Patrick v. Union State Bank,* 681 So. 2d 1364 (Ala. 1996), that opinion "has met with near universal disapproval."  *SFS Check, LLC v. First Bank of Delaware*, 774 F.3d 351, 357 (6th Cir. 2014) (quoting *Brunson v. Affinity Fed. Credit Union,* 199 N.J. 381, 401-402 & 402 n.12  (2009) (finding "no published decision and but one unpublished case that follows *Patrick* without qualification")).  "Even the Alabama Supreme Court has admitted that their 'inquiry in *Patrick* was not properly focused.'"  *Id.* (citing *Smith v. AmSouth Bank, Inc.,* 892 So. 2d 905, 911 (Ala. 2004)).  This Court thus finds that Virginia would be unlikely to deviate from the weight of the authority on this matter and these allegations are insufficient to establish a duty owed by Chase to Plaintiff.

Plaintiff alternatively argues that Chase incurred a duty to disclose fully by "making a partial disclosure" to Plaintiff.  Dkt. 22 at 13.  As support, Plaintiff cites *Bank of Montreal v. Signet Bank*, 193 F.3d 818 (4th Cir. 1999), which states that a duty of disclosure "may arise . . . if one party takes actions which divert the other party from making prudent investigations (*e.g.*, by making a partial disclosure)," *id.* at 829.  Here, however, it is only alleged that, in response to a phone call from Plaintiff, a Chase representative "indicated that the receiving account had already

been flagged as fraudulent but would not disclose any additional information." Dkt. 1-2 ¶ 46. To this extent such a statement could be considered a partial disclosure, it is clear that Chase's actions did not "divert" Plaintiff from "making prudent investigations," as Plaintiff continued with its own investigation after speaking with the Chase representative. *See, e.g.*, Dkt. 1-2 ¶ 47 (filing criminal reports with the Fairfax County Police Department, the Virginia Attorney General's Office, and the FBI); *id.* ¶ 48 (asking Bank of America for an update); *id.* ¶ 50 (same); *id.* ¶ 51 (same); *id.* ¶ 52 (calling Bank of America "to push for more details"); *id.* ¶ 53 (speaking with a Bank of America local branch manager); *id.* ¶ 54 (demanding more information from Bank of America); *id.* ¶ 56 (demanding disclosure of information from Bank of America through counsel). "A plaintiff who, after a misrepresentation has been made, undertakes a full investigation of the misrepresented information cannot claim justifiable reliance on the misrepresentation." *Bank of Montreal*, 193 F.3d at 827. Accordingly, the Court finds that Plaintiff fails to state a claim for fraudulent concealment against Chase, and Chase's Motion will be granted as to Count I on that ground.

### D. Whether Plaintiff States a Claim for Negligence Against Chase

In Count III, Plaintiff asserts a negligence claim based on Chase's alleged breach of a "duty to exercise reasonable care in the implementation and execution of [its] verification procedures to prevent fraud and theft by its account holders." Dkt. 1-2 ¶ 81. Specifically, Plaintiff alleges, "[u]pon information and belief, Chase failed to follow its verification procedures when it allowed an individual or individuals having no affiliation with Making Cents to open an account in Houston, Texas under Making Cents' name and its Washington, D.C., business address," which resulted in damages to Plaintiff. *Id.* ¶¶ 82-83. Here again Plaintiff fails to state a claim.

The parties disagree as to whether Virginia law or Texas law governs Plaintiff's negligence claim against Chase. Under either state's laws, however, the elements of a negligence claim are:

(1) a legal duty, (2) a breach or violation of that duty, and (3) proximate causation resulting in injury. *See Atrium Unit Owners Ass'n v. King*, 266 Va. 288, 585 S.E.2d 545, 548 (Va. 2003); *W. Inv., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex. 2005). As discussed *supra*, Plaintiff does not allege that it was a Chase customer, and, in general, "a bank does not owe noncustomers a duty of care." *Eisenberg*, 301 F.3d at 227. Although Plaintiff again contends that "Chase incurred a duty to DPI-MCI when it opened an account in the name of one of DPI-MCI's two member entities," Dkt. 22 at 17, for the same reasons discussed *supra*, the Court finds that the Supreme Courts of Virginia and Texas would likely adopt the majority approach in finding that these allegations are insufficient to establish a duty owed to Plaintiff, *see, e.g.*, *SFS Check, LLC*, 774 F.3d at 357 ("The almost-universal law in this country is that banks owe a duty of care only to their own customers."); *Eisenberg*, 301 F.3d at 225 ("Courts in numerous jurisdictions have held that a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship."); *id.* at 226 ("[I]t has been held that banks do not owe a duty of care to noncustomers even when the noncustomer is the person in whose name an account was fraudulently opened."); *but see Elkin Valley Baptist Church v. PNC Bank, N.A.*, 748 F. Supp. 3d 293, 348 (W.D. Pa. 2024) (finding that, based on the "breadth" of common law duties under Pennsylvania law, including duties to strangers to contracts, a plaintiff had "plausibly supported a conclusion that by opening a bank account for an unidentified holder, and dispensing with safeguards required by its own procedures and by federal regulation such as [know-your-customer laws], [the defendant bank] engaged in affirmative conduct that foreseeably increased the risk that a person in [the plaintiff's] position would be victimized by

fraud").[8]  Accordingly, Plaintiff fails to state a claim for negligence against Chase, and Chase's

Motion will be granted on this basis as to Count III.

### E.  Whether Plaintiff States a Claim for Misdescription of a Beneficiary Against Chase

In Count II, Plaintiff asserts a claim for misdescription of a beneficiary, pursuant to UCC

§ 4A-207,[9] against Chase.  Article 4A-207(b) provides the applicable standard:

> If a payment order received by the beneficiary's bank identifies the beneficiary both by name and by an identifying or bank account number and the name and number identify different persons, the following rules apply:
>
> (1) Except as otherwise provided in subsection (c), if the beneficiary's bank does not know that the name and number refer to different persons, it may rely on the number as the proper identification of the beneficiary of the order.  The beneficiary's bank need not determine whether the name and number refer to the same person.
>
> (2) If the beneficiary's bank pays the person identified by name or knows that the name and number identify different persons, no person has rights as beneficiary except the person paid by the beneficiary's bank if that person was entitled to receive payment from the originator of the funds transfer.  If no person has rights as beneficiary, acceptance of the order cannot occur.

"[I]n this context, "'[k]nowledge" means actual knowledge,' not imputed knowledge or

constructive knowledge."  *Studco Bldg. Sys. US, LLC*, 133 F.4th at 273.

Plaintiff has not pleaded sufficient facts to allow a reasonable inference that Chase *actually*

*knew* that the account number and name "Making Cents" identified different persons.  Plaintiff has

---

[8] Moreover, even if Chase owed a duty to Plaintiff to exercise reasonable care in the implementation and execution of its verification procedures, Plaintiff has not plausibly alleged that Chase breached that duty.  Although Plaintiff states that, "upon information and belief, Chase failed to follow its verification procedures," as discussed *supra*, allegations based on information and belief "veer away from supporting plausible inferences."  *Carter*, 2018 WL 3614975, at *9. Here, Plaintiff's basis for this assertion appears to be pure speculation.

[9] The parties again dispute whether Virginia or Texas law applies to this claim.  As noted *supra*, however, Article 4A of the UCC has been codified under both Virginia and Texas law, Va. Code § 8.4A *et. seq.*; Tex. Bus. & Comm. Code § 4A *et seq.*, and the parties do not present any differences in the law at this stage.

alleged only that (1) Chase has adopted policies for verifying accounts in accordance with federal "know-your-customer" laws which require an authorized representative of a corporation to appear in person at a branch and present documents including government identification, an Employment Identification Number, certified articles of incorporation, and proof the business is entitled to operate in the state of organization, (2) Making Cents does not operate in Texas, has never opened an account there, and no one in Texas has the authority or documents to open a bank account there on Making Cents' behalf, and (3) an account was opened in Houston in Making Cents' name. *See* Dkt. 1-2 ¶¶ 69-72. Although these allegations leave open the possibility that Chase had actual knowledge that Making Cents was not the accountholder, they do not render such allegations plausible.

Although Plaintiff (without elaboration) cites to the 2023 district court decision in the *Studco* case for the proposition that a bank "cannot ignore their own systems to prevent fraud in order to claim that they did not have actual knowledge of said fraud," 2023 WL 1926747, at *14 (E.D. Va. Jan. 12, 2023), , that decision was reversed on appeal to the Fourth Circuit, *Studco*, 133 F.4th at 268 ("Because there was no evidence of actual knowledge presented in this case, it was error for the court to have held 1st Advantage liable on a finding of negligence or commercial unreasonableness."). The other case on which Plaintiff relies, *Elkin Valley*, is distinguishable and otherwise not binding on this Court. In that case, the plaintiff alleged that the fraudulent actor opened the account at issue in a name other than that of the contractor to whom the plaintiff later attempted to send funds and that a business account manager at a local branch of the bank assisted in opening the account. 748 F. Supp. 3d at 321. Based on these allegations, the *Elkin Valley* Court found that these facts plausibly alleged that the bank received knowledge that the account number identified a person other than the contractor, such that when it received the payment order listing

the contractor as the beneficiary with the account number, it had actual knowledge that the account number and contractor name identified different entities. *Id.* Here, Plaintiff alleges that the fraudulent account was created in Making Cents' name which matched the beneficiary listed on the payment order. Accordingly, regardless of whether the *Elkin Valley* decision would be a correct application of the law within the Fourth Circuit, the *Elkin Valley* Court's reasoning is inapplicable here.

Thus, Plaintiff has failed to state a claim for misdescription of a beneficiary against Chase, and Chase's Motion will be granted as to Count II on this basis.

\*\*\*

Accordingly, it is hereby ORDERED that Defendant Bank of America, N.A.'s Motion to Dismiss (Dkt. 13) is GRANTED; and it is

FURTHER ORDERED that Defendant JPMorgan Chase Bank, N.A.'s Motion to Dismiss (Dkt. 16) is GRANTED; and it is

FURTHER ORDERED that the Complaint (Dkt. 1-2) is DISMISSED.[10]

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all counsel of record.

It is SO ORDERED.

Alexandria, Virginia
September 25, 2025

/s/
Rossie D. Alston, Jr.
United States District Judge

---

[10] Based on the nature of the allegations here and the number of allegations made "upon information and belief," it does not appear to the Court that there are additional allegations that Plaintiff could make to render its claims plausible. Accordingly, the Court will not automatically provide an opportunity for amendment. If Plaintiff believes that it could make additional allegations, Plaintiff may file a motion to amend within fourteen (14) days of the date of the issuance of this Memorandum Opinion and Order. The Court will not instruct the Clerk of the Court to close this case until after the passage of that time.